A. C. ALEXANDER v. ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, Appellant.—38 S. W. (2d) 1023.

Division One, May 21, 1931.

*E. T. Miller, Mann & Mann* and *J. W. Miller* for appellant.

1014

*Schmook & Sturgis* for respondent.

FERGUSON, C.—This is an action for personal injuries sustained by plaintiff and damage to plaintiff's automobile truck and cargo in a collision between one of defendant's trains and said truck when driven by plaintiff upon the crossing of Sherman Avenue over defendant's railroad track, in the city of Springfield, Missouri. The jury returned a verdict for defendant. The trial court sustained plaintiff's motion for a new trial on the ground that the verdict was against the weight of the evidence, and defendant appealed. The appeal went to the Springfield Court of Appeals, being within the jurisdiction of that court. In an opinion by BRADLEY, J., reported at 4 S. W. (2d) 888, the Court of Appeals reversed and remanded the cause with directions to the trial court to reinstate the verdict and enter judgment for defendant thereon, but certified and transferred the case to this court on the ground that the "holding respecting the consideration of prior or antecedent negligence in the application of the humanitarian doctrine is in conflict with the holding of the Kansas City Court of Appeals in Smith v. Railroad, 282 S. W. 62; Ruenzi v. Payne, 208 Mo. App. 113, 231 S. W. 294; Murrell v. Railroad, 105 Mo. App. 88, 79 S. W. 505; and Williams v. Railroad, 149 Mo. App. 489, 131 S. W. 115."

When a cause is transferred by a court of appeals on the ground and in the manner specified by our Constitution (Sec. 6 of the

Amendment of 1884 to Art. 6), this court acquires jurisdiction for all purposes, and will consider and determine the cause as if it had come here on a direct appeal from the circuit court. [Block v. U. S. Fid. & Guar. Co., 316 Mo. 278, 290 S. W. 429; Williams v. Kansas City Terminal Ry. Co., 288 Mo. 11, 231 S. W. 954; City of Brunswick ex rel. Barkwell v. Benecke, 289 Mo. 307, 233 S. W. 169.] It is therefore our duty to review the cause and determine this appeal as though jurisdiction had been obtained by ordinary appellate process.

The issues upon the pleadings are clearly and concisely defined in the Court of Appeals' opinion as follows: ''The petition alleged: (1) The breach of a city ordinance limiting the speed of trains to ten miles per hour; (2) failure to give the statutory signals; (3) failure to keep a proper lookout; and (4) a breach of the humanitarian rule. The answer was a general denial and a charge of contributory negligence. The plea of contributory negligence is based upon the alleged failure of plaintiff to observe the care required of him in approaching a railroad crossing and the alleged breach of a city ordinance requiring all vehicles to come to a complete stop before proceeding across the street where the collision occurred. The cause went to the jury on all the alleged grounds of negligence.''

Appellant (defendant below) contends that the humanitarian doctrine cannot, under the facts, be invoked and that the evidence shows respondent (plaintiff below) was guilty of contributory negligence as a matter of law and he therefore cannot recover, and that the action of the trial court in granting a new trial cannot be sustained on any theory. Since there is substantial evidence tending to establish the allegations of primary negligence, the principal questions remaining for our determination are: (1) Was the respondent guilty of contributory negligence as a matter of law? And (2) is there any substantial evidence to support a verdict for plaintiff under the humanitarian doctrine?

Defendant's railroad track, running in a northeasterly-southwesterly direction, crosses Sherman Avenue in the city of Springfield. Sherman Avenue runs north and south and is a paved and much traveled street. The collision occurred on this crossing at about 7:15 A. M., November 19, 1926. The train was a passenger train, No. 7, running out of St. Louis, made up of engine and tender, passenger coaches, sleeping cars, baggage and express cars, aggregating twelve or fourteen coaches. It was due at that point ''a little before seven o'clock A. M.'' and at the time the collision occurred was running late. As the train approached the crossing it was running at a speed of from forty to forty-five miles per hour. Respondent, Alexander, assisted by a young man, Carl Akers, was engaged in delivering milk over a regular route which he had

traveled daily for more than two years. He was driving his Ford truck which was fitted with a "specially built body eighteen feet long, cab and all." The truck was loaded with cases of bottled milk and cream and large cans of milk. A store located west of Sherman Avenue, and about forty-five or fifty feet north of the railroad track, was regularly served by Alexander in making his daily deliveries of milk. On this morning as the truck proceeded south on Sherman Avenue, the helper, Akers, left the truck north of the store to deliver milk, and Alexander continued on to and made the delivery at the store. He stopped the truck south of the store and at a point which he testified, by actual measurements afterwards made, was twenty-seven feet from the nearest or north rail of the railroad track. Upon starting at this point Akers cranked the engine and stepped on the truck as it moved away. Alexander driving, proceeded, without again stopping, south toward and onto the railroad track, moving "in low" at three to four miles an hour, to the point of collision. The truck had almost cleared the track on the south when it was struck by the engine at the rear left corner "right back of the wheel." Six hundred feet northeast of the crossing the railroad track curves to the left and north, and a train approaching the crossing from that direction cannot be seen from the point twenty-seven feet from the north rail from whence respondent started, nor from that point to the track, until the engine passes around the curve. This distance is fixed by respondent's testimony, based upon actual measurements which he made. There is a grade from the point at which respondent started to the track. Respondent testified: "Before I got in the car I looked, and after I started the car I looked, and there was nothing in sight, no sign of a train. As I went on the track I looked in the northeast direction, the way the train was coming, and there wasn't any train in sight. I looked and listened both. I didn't hear any bell or whistle. After I looked and listened I then went on and proceeded to cross the track. Just as I entered the track the train came around there in sight. When I first discovered there was a train coming I was just over the first rail, just on the track far enough that I couldn't stop. I either had to back up or go on. I tried to get across and the train struck me. When I saw the train coming I had entered the track. The first knowledge that I had that a train was coming was when I saw the train coming around that curve. When I started I was then a distance of twenty-seven feet from the track. I looked before I got in and afterwards just before I started. I looked both ways. I kept looking back that way until I entered the track. I got on the track, my front wheels were just over the north rail, when I saw the train coming. The train was just coming around the curve about 600 feet up there when I saw it coming then." He further testified that

the first signal given by the train as it approached the crossing was "a loud whistle after I saw it."

As we have heretofore stated, there is substantial evidence tending to convict appellant of primary negligence and to make that an issue for a jury with the issue of contributory negligence on the part of respondent, unless the evidence shows the respondent was guilty of contributory negligence as a matter of law. Appellant's contention that respondent was guilty of contributory negligence was sustained by the Court of Appeals, that conclusion being arrived at by the following calculations based upon distances as measured by plaintiff and the speed of the train as shown by the testimony of witnesses offered by plaintiff, as follows:

"Since plaintiff's truck had all but cleared, it is reasonable to deduce from the evidence that before the impact the truck had traveled, after starting up, these distances: twenty-seven feet to the north rail; four feet eight inches, the distance between the rails; eighteen feet, the length of the truck, from the south rail. This would leave only the extreme rear of the truck to be caught by the overhang of the engine. The sum of the distances mentioned is approximately fifty feet. If the truck traveled three miles per hour, the rate per second was 4.4 feet. On this basis the truck traveled 11.36 seconds from the time of starting until the impact. If the train was running forty-five miles an hour, its rate per second was sixty-six feet. In the 11.36 seconds while the truck was traveling fifty feet, the train traveled 749.76 feet. It was 600 feet from the crossing to the curve where the train would be visible. Therefore when plaintiff started his truck, the train was approximately 150 feet north of the curve and could not then be seen by plaintiff. But the train ran the 150 feet, assuming its rate to be forty-five miles, in 2.27 seconds. In the same time plaintiff, at the rate of three miles per hour, traveled 9.98 or approximately ten feet. Therefore when plaintiff's truck was seventeen feet north of the north rail, the train was at the curve and visible. Plaintiff testified that after he started his truck he 'kept looking back that way' until he entered the track. He also testified that he could easily have stopped his truck in three feet at the rate he was moving. If the train was plainly visible when plaintiff was seventeen feet from the track and he could easily have stopped in three feet, then it was his duty to stop. Plaintiff was required to exercise the highest degree of care. [Laws 1921, 1st. Ex. Sess., p. 91.] He testified that he looked and did not see the approaching train; but the conculsion is inevitable, on the deduction made, that he either did not look when to look was to see, or that he looked and saw, but attempted to cross ahead of the train. In the circumstances there is no escape from the conclusion that plaintiff was guilty of contributory negligence."

1020

In the foregoing calculations the court adopted the highest estimate of the speed of the train made by witnesses and the lowest estimate of the speed of the truck as given by respondent. The distances are fixed by respondent and based upon actual measurements made by him. Allowing for probable inaccuracy in estimating the speed of the train and assuming that the train may in fact have been running at a higher rate of speed than that estimated by the witnesses, yet unless we are justified, as we are not, in assuming that the train was traveling at a rate of speed of approximately sixty-eight miles an hour, the respondent could have and must have seen the train, if he had looked as he drew near to the track, in ample time to have stopped, as the testimony was the truck could have been stopped within three feet.

Recalling the time and distance in which the train was stopped and the testimony relating thereto, which will be hereinafter discussed, as well as all the testimony in the case bearing on the question of speed, and indulging respondent the most favorable inferences therefrom, we do not think the testimony permits the inference that the train was traveling at a rate of speed which would allow a deduction relieving respondent of negligence. We are not overlooking respondent's positive testimony that "he kept looking back that way and there wasn't any train in sight" during the time he was traveling the distance of twenty-seven feet from the point at which he started to the first or north rail of the track, at which point he says he saw the train for the first time and that it was then just rounding the curve 600 feet to the northeast, the first point at which it would become visible. If that testimony were reconcilable with the physical and indisputable facts in evidence, the question of his negligence would be for a jury, but since his positive testimony is wholly irreconcilable with the physical and indisputable facts established and shown by the evidence offered on the part of the respondent such facts must prevail and we are required to hold that the evidence shows respondent to have been guilty of contributory negligence, and it follows that because of his own negligence plaintiff cannot recover unless there is sufficient evidence to take the cause to a jury on the humanitarian doctrine.

The humanitarian doctrine was submitted by the following instruction, the part in parenthesis being stricken out by the court:

"You are further instructed that although you may find that plaintiff was negligent in not carefully looking out for a coming train while he was approaching or going upon defendant's railroad track at the crossing in question, or failed to properly

observe the ordinance requiring him to stop before proceeding across the railroad track, yet if you find that after plaintiff was guilty of such negligence he was in a place of peril, and the defendant's servants running and operating the train in question saw, or by the exercise of watchful care could have seen, that plaintiff was in a position of peril, if he was in such peril, and from which peril it was reasonably apparent to the operators of the train that plaintiff could not or would not likely extricate himself, and that said operators of the train, knowing his peril, could by using ordinary care with the means and appliances at hand, and with safety to the passengers and employees of defendant, have avoided striking plaintiff's truck by stopping or lowering the speed of the train (or by a more prompt warning by the bell or whistle), then you will find for the plaintiff, and in determining whether defendant could in the manner and by the means stated have avoided striking plaintiff's motor truck, you will determine same on the basis of defendant's train being run at not exceeding ten miles per hour, as required by the city ordinance.''

The instruction authorizes the application of the humanitarian doctrine to a state of facts which would have existed had appellant complied with the city ordinance limiting the speed of trains to not exceeding ten miles an hour, rather than to the actual facts of the existing situation. The instruction followed and was based upon the rule announced by the Kansas City Court of Appeals in cases cited, supra, and set out in the opinion of the Springfield Court of Appeals. The Springfield Court of Appeals correctly held that prior or antecedent negligence should not be considered in determining liability under the humanitarian doctrine. This court ruled the question in State ex rel. Fleming et al. v. Bland et al., 322 Mo. 565, 15 S. W. (2d) 798, where it is said:

''Many cases decided by this court impliedly hold that a situation of imminent peril is the basic fact of the humanitarian doctrine; that no duty whatever arises under that doctrine, unless and until a situation of peril comes into existence; and that when such peril arises the doctrine seizes upon the situation as it then exists and requires the one operating the dangerous instrumentality to exercise ordinary care in certain respects: to make timely discovery of the peril, if it was his duty to be on the lookout, and thereafter to avoid the infliction of the threatened injury, if he can do so with the means at hand and without jeopardizing the safety of himself and others. [See Banks v. Morris & Co., 302 Mo. 254; State ex rel. Vulgamott v. Trimble, 300 Mo. 92.]

''The ruling that the antecedent negligence of a defendant may be taken into consideration in determining whether he was negligent under the humanitarian rule would in many cases permit

an unwarranted recovery for primary negligence through the elimination, under the guise of that rule, of the defense of contributory negligence. The Kansas City Court of Appeals has, however, so ruled in the following cases: Smith v. Railroad, 282 S. W. 62; Ruenzi v. Payne, 208 Mo. App. 113, 231 S. W. 294; Goben v. Railroad, 206 Mo. App. 5, 226 S. W. 631; Williams v. Railroad. 149 Mo. App. 489, 131 S. W. 115, and Murrell v. Railroad, 105 Mo. App. 88, 79 S. W. 505. Those cases to the extent of such ruling are disapproved.''

If there is any substantial evidence to support a verdict for respondent under the humanitarian rule, correctly applied to the conditions actually existing at the time, the order of the trial court granting a new trial should be affirmed; if. not, the order granting a new trial should be set aside, the verdict reinstated and judgment entered thereon, and in determining this question we should give respondent the benefit of the most favorable inferences arising from the most favorable testimony in the whole. case. Recurring to the estimates in evidence of the speed of the train as being from forty to forty-five miles an hour, the estimate made as to the rate defendant's truck was moving and assuming that the train was running at a speed of forty-five miles an hour, as the engine came around the curve 600 feet from the crossing, the engine-men had a clear, full and unobstructed view of the crossing and of Sherman Street north thereof beyond the point from which respondent started his truck, and at that time respondent's truck would have been at least seventeen feet from the north rail of the track, moving toward the track. If the train was moving at forty miles an hour, the engine was 566 feet from the crossing when respondent's truck started toward the crossing. The truck and the movement thereof as it continued unchecked and without any slackening of its speed, toward and onto the track, was at all times within view of the engine-men, after the engine came around the curve 600 feet from the crossing, had they looked. as it was their duty to do. This was a much traveled public street crossing in a populous city and the trainmen should have anticipated that travelers along the street might be upon the crossing. It is to be assumed, as there is no evidence to the contrary, that the engineer was in his proper place in the cab of the engine, looking out upon the track for the purpose of observing those who might be upon the crossing or about to enter thereon, and actually saw what he might have seen.

Respondent and Carl Akers, his helper, who was riding with respondent in the cab of the truck, both testified that they did not hear any alarm by bell or whistle until after the truck was on the track with the front wheels across the north rail, when a whistle

was sounded. Witness L. E. Price, who stood on the porch of the store and saw the collision, testified: "When I first saw the train it was coming around that space where you could plainly see it within 400 or 500 feet of the crossing. Mr. Alexander was within a few feet of the track when I saw the train coming around the curve up there. He was within twelve or fifteen feet of the crossing when I first saw the train up there. The train just came right on ahead down there—it didn't whistle until it was within probably thirty-five or forty feet of Mr. Alexander."

According to the calculations appellant makes to convict respondent of contributory negligence, and assuming the speed of the train to have been forty-five miles an hour, we think it a reasonable inference that when respondent, without stopping or slackening the speed of the truck, continued moving upgrade and toward the track and came within ten feet of the track or so near thereto as five and one-half feet, it must have become apparent to the engine-men that, unaware of the approach of the train, he was about to enter upon the track, intent upon doing so and in a position of impending peril. At that point of time the train would have been approximately 495 to 429 feet or 7.5 to 6.5 seconds from the crossing, and a jury might well and justifiably conclude that a sharp blast of the whistle would have arrested respondent's attention and saved him from entering upon the track, since the truck could have been stopped within three feet, and that the engine-men were negligent in not acting promptly in giving an alarm under such circumstances.

There was substantial evidence which, allowing respondent the most favorable inferences therefrom, tended to show that had the engine-men upon first discovering respondent in a position of peril or when, by the exercise of ordinary care, they could have discovered his perilous position, promptly used the means at hand to slacken the speed of the train, the collision might have been averted, thereby making an issue to go to a jury under the humanitarian rule, and precluding the court from holding with appellant's contention that under the facts respondent cannot invoke the humanitarian doctrine.

The train was composed of the engine and tender and twelve or fourteen coaches and while there is no direct testimony as to the length of the various coaches, we think it a conservative estimate, properly made, that the train was at least 520 feet in length. When, after the collision, the train was stopped, the rear coach stood 760 feet from the point of impact and the engine of the train had run a distance of 1280 feet from that point. The witness Price testified that before the train struck the truck there was no slackening of the speed. Respondent offered two expert

witnesses, employees of appellant and locomotive engineers. They testified as to the type of engine regularly used on this train and the kind of brake equipment and other equipment of the train. The engineers were interrogated as to the distance in which the train could be stopped, without jeopardy to the passengers or trainmen, running at a speed of forty miles, twenty miles and ten miles an hour. The questions relating to the stopping of the train at a speed of twenty miles and ten miles an hour were for the purpose of developing those facts in support of the theory set out in the instruction, later asked and given, authorizing the jury, in the application of the humanitarian rule, to determine whether the trainmen could have averted the collision had the train been running at a speed not exceeding ten miles per hour, as required by the city ordinance. That instruction, as we have pointed out, erroneously authorized the jury to take into consideration antecedent negligence instead of applying the humanitarian doctrine to the actual, instant and existing facts. One of the engineers, who stated that he was the engineer on this train every eighth morning, but was not on the engine the day of the collision, testified that the train, running at the rate of forty miles per hour, could be safely stopped in a distance of from 1000 to 1200 feet. The other engineer testified that an appreciable reduction of speed, a reduction to some extent, would result upon an emergency application within 150 to 200 feet. Witness Price testified that he was familiar with the sound or "noise" that results when an emergency application is made and that he did not hear that sound until after the train struck the truck. There was no testimony as to the distance in which the train could have been stopped running at a rate of speed in excess of forty miles an hour. As there was testimony that the train was running at the rate of from forty to forty-five miles an hour, it may be assumed that it was running at the rate of forty miles an hour, which would have placed the train at a distance of from 365 to 435 feet from the crossing at the time when it might be said to have become apparent to a prudent engineer in the exercise of the care commensurate with his duty both to his passengers and to travelers upon a public street crossing the railroad track in a populous city, that respondent was in a position of peril. Since the train could have been safely slowed and brought to a stop by an emergency application within 1000 to 1200 feet, and ran 1280 feet from the point of impact before it was brought to a stop, an inference may properly be drawn that no effort whatsoever was made to go into emergency until after the collision occurred. The testimony warrants the conclusion that had the engineer gone into emergency promptly at the time when, by the exercise of ordinary care, he should have discovered re-

spondent in a perilous position, the train then being some 365 to 435 feet from the point of impact, and allowing some three to four seconds for the emergency operation, there would have been a distance of from 190 to 200 feet to the point of impact during which the speed of the train would have been appreciably and to some extent slackened. It is evident that the slightest slackening in the speed of the train would have enabled respondent to have cleared the track in safety. The difference of a fraction of a second in time and a few feet in distance would have averted the collision.

The appellant offered testimony that the approaching train was plainly visible about the time the respondent started the truck and that the whistle was sounded as the train came around the curve, but though the record discloses that the engineer and fireman who were on the engine at the time of the collision were present in the court room during the trial, they were not called as witnesses. The failure of appellant to call the engineer and fireman as witnesses authorizes the inference that their testimony would have been unfavorable to appellant. [State ex rel. Wabash Ry. Co. et al. v. Trimble et al. (Mo. Sup.), 260 S. W. 1000.]

Allowing respondent the benefit of all reasonable and favorable inferences from distances, time and speed, as shown by the evidence, and the failure of appellant to call the engineer and fireman as witnesses, we cannot declare as a matter of law that there was not sufficient time after respondent's peril became apparent to sound a timely warning, or that there was not thereafter sufficient time and distance to, in some degree, slacken the speed of the train. Whether, in the exercise of ordinary care, the engineer, by prompt action under the existing circumstances, could have given a timely warning or slackened the speed of the train and thereby have averted the collision, are questions to be resolved by a jury.

This was the first trial of the cause in the circuit court and a new trial was granted on the ground that the verdict of the jury was against the weight of the evidence. Since there is substantial evidence to support a verdict for respondent upon the humanitarian doctrine, the discretion allowed the trial court in granting a new trial was not improperly exercised and the order granting a new trial is therefore affirmed. *Seddon, C.,* concurs; *Sturgis, C.,* not sitting.

PER CURIAM:—The foregoing opinion by FERGUSON, C., is adopted as the opinion of the court. All of the judges concur.